817 So.2d 1067 (2002)
The HARTCOURT COMPANIES, INC., Appellant,
v.
Charles E. HOGUE, Appellee.
No. 5D01-683.
District Court of Appeal of Florida, Fifth District.
June 7, 2002.
*1069 David H. Popper and Timothy N. Bench of Rissman, Weisberg, Barrett, Hurt, Donahue & McLain, P.A., Orlando, for Appellant.
David C. Willis and Heath R. Stokley of Mateer & Harbert, P.A., Orlando, for Appellee.
THOMPSON, C.J.
The Hartcourt Companies, Inc. (THC) appeals a final judgment in favor of Charles E. Hogue. THC contends that the trial court erred in denying its motion to dismiss for lack of jurisdiction, its motion to set aside a default, and in entering a default judgment. We reverse because we conclude that the court lacked personal jurisdiction over THC.
Hogue sued THC for breach of contract, alleging that THC offered him a fee of 1.5% of the amount of any investment it made as a result of Hogue's referral. The fee was to be payable in company stock. According to the complaint, as a result of Hogue's referral, THC entered an investment contract with UAC Stock Exchange Online Company, Ltd. Hogue alleged that THC agreed it owed him stock as a fee, but did not agree with Hogue on the valuation date of the stock.
In support of its motion to dismiss, THC alleged that it was a Utah corporation whose principle places of business were in Utah and California. It alleged that it had never: (1) qualified to do business in Florida; (2) had a registered agent in Florida; (3) owned any real estate in Florida; (4) maintained any offices or employees in Florida; (5) transacted business in person in Florida; and (6) leased any facilities in Florida.
In response, Hogue, a resident of Maitland, Florida, filed an affidavit alleging that he found THC's web site while browsing the internet. He bought stock in THC, and began monitoring the THC site and other sites devoted to investments. He learned through a THC press release that THC's president, Dr. Alan Phan, would be traveling to China to seek investment opportunities there. On May 25, 1999, Hogue telephoned and e-mailed THC, stating that he had information regarding investment opportunities in China. He left his telephone number and the address of his residence.
According to Hogue's affidavit, Phan telephoned Hogue the next day to express his interest, and asked for "preliminary information." On May 27, 1999, Hogue sent Phan the "preliminary information" by email. Hogue alleged that on May 27, 1999, Phan telephoned Hogue saying that THC was definitely interested in Hogue's information, and offered to send Hogue a "contract offer that would pay Hogue a referral fee in exchange for information and efforts in connecting THC with persons in China with investment opportunities." Later that day, Hogue received an e-mail from Phan stating the terms of the agreement. At this time, Hogue alleged, Phan knew that Hogue resided in Florida and would be performing his services in Florida.
Hogue alleged that he accepted the offer in an e-mail, and provided the name, address, *1070 telephone number, and e-mail address of a contact person who was in China. Hogue also notified the contact person that THC was interested in investment opportunities and would be calling on him. On May 28, 1999, Hogue again e-mailed Phan, giving him the contact person's numbers. Hogue alleged that in May and June 1999, he incurred expenses in performing services, including making telephone calls to China to introduce the contact person to THC. On June 10, 1999, Phan e-mailed Hogue with an update on his China travels. Having monitored the progress of THC's China investments, Hogue e-mailed Phan in November 1999, reminding him of the agreement. Phan responded by e-mail, stating that he had "lost the written terms of the contract," and asked for a copy. Hogue had several additional contacts with Phan and Fred Cohn of THC during November, December and January 2000. In late January, Cohn contacted Hogue to give his calculation of the amount owed Hogue, and mailed Hogue a check at his residence. (Hogue rejected the check and the litigation ensued).
A copy of the e-mail containing the terms of the agreement was attached to Hogue's complaint:
Thanks for the Emails and our phone conversation.
We hereby confirm that THC will pay you a referral fee for any successful conclusion of any transaction introduced by you. The fee will be 1.5% of the total investment made by THC in the project or transaction mentioned. The maximum amount will be capped at $250,000. Fee will be payable in HRCT common shares, valued at the closing trading price of HRCT the date of the transaction signing.
I might go back to China around 6/27; but if your friend has a real interesting deal, based on the info I receive, I will re-arrange my schedule.
The determination of jurisdiction involves a two part inquiry. First, it must be determined whether the complaint alleges sufficient jurisdictional facts to bring the action within the ambit of section 48.193, Florida's long arm statute. Venetian Salami Co. v. Parthenais, 554 So.2d 499, 502 (Fla.1989). If the allegations are within the ambit of the statute, it must then be determined whether the exercise of jurisdiction is consistent with due process. Id. Under section 48.193(1)(g), a person submits himself to the jurisdiction of this state by "[b]reaching a contract in this state by failing to perform acts required by the contract to be performed in this state." Where a contract does not state the place where payment is due, the legal presumption is that a debt is to be paid at the creditor's place of business. Unger v. Publisher Entry Servs., Inc., 513 So.2d 674, 676 (Fla. 5th DCA 1987). The presumption that a debt is to be paid at the creditor's place of business, in the absence of an express designation of place of payment, is sufficient to satisfy the language of Florida's long arm provision that refers to contractual acts "required" to be performed in Florida. Kane v. American Bank of Merritt Island, 449 So.2d 974 (Fla. 5th DCA 1984). In the instant case, the requirements of the statute have been met because THC allegedly failed to pay a debt that is presumed to have been payable in Florida.
As noted, the next question is constitutional:
"[T]he constitutional touchstone" of the determination whether an exercise of personal jurisdiction comports with due process "remains whether the defendant purposefully established `minimum contacts' in the forum State." Burger King Corp. v. Rudzewicz, 471 *1071 U.S. 462, 474, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985), quoting International Shoe Co. v. Washington, 326 U.S. [310], at 316, 66 S.Ct. [154], at 158 [90 L.Ed. 95 (1945)]. Most recently we have reaffirmed the oft-quoted reasoning of Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958) that minimum contacts must have a basis in "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King, 471 U.S., at 475, 105 S.Ct., at 2183. "Jurisdiction is proper ... where the contacts proximately result from actions by the defendant himself that create a `substantial connection' with the forum State." Ibid., quoting McGee v. International Life Insurance Co., 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957) (emphasis in original).
Christus St. Joseph's Health Sys. v. Witt Biomedical Corp., 805 So.2d 1050, 1053 (Fla. 5th DCA 2002) (quoting Asahi Metal Indus. Co., Ltd. v. Superior Court of Solan. Cty. Cal., 480 U.S. 102, 108-09, 107 S.Ct. 1026, 94 L.Ed.2d 92, (1987)).
The requisite minimum contacts exist where "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." Id. (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559 (1980)). Prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing, must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum. Id. (citing Burger King, 471 U.S. at 479, 105 S.Ct. 2174). The underlying test for sufficiency of minimum contacts is whether maintenance of the suit offends "traditional notions of fair play and substantial justice." Quality Christmas Trees Co., Inc. v. Florico Foliage, Inc., 689 So.2d 1222, 1223 (Fla. 5th DCA 1997) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).
The minimum contacts required by the due process clause is not satisfied by a mere showing that a Florida party entered a contract with an out-of-state party. Christus St. Joseph's Health Systems, 805 So.2d at 1054-55 (citing Quality Christmas Trees, 689 So.2d at 1223). Nor is it satisfied merely because payment must be made in Florida. Venetian Salami, 554 So.2d at 503. An on-line connection coupled with a requirement that payment be made in Florida will not support personal jurisdiction. Id. at 1054 (citing Pres-Kap, Inc. v. System One, Direct Access, Inc., 636 So.2d 1351 (Fla. 3d DCA 1994)). On the other hand, where a nonresident defendant enters a contract through its agent in Florida, for services to be performed in Florida, the defendant purposely avails itself of the privilege of conducting activities in Florida, thus invoking the benefits and protections of its law. Linger, 513 So.2d 674.
In the instant case, although it took a few telephone calls and e-mail transmissions to make the arrangements, the agreement was an isolated transaction as in Quality Christmas Trees. The agreement did not give rise to a continuing relationship between the parties, as in Burger King, where the parties' franchise agreement contemplated a long-term, intimate relationship between the defendant franchisee and the Florida franchisor. Further, unlike the situation in Venetian Salami, where it was alleged that the nonresident defendant solicited the Florida plaintiff for services to be performed in Florida, here, it was Hogue who solicited THC. Finally, unlike Burger King, and *1072 like Christus St. Joseph's Health Systems, nothing in the negotiations suggested a focus on or future consequences in Florida. Accordingly, we do not think it can be said that THC purposely availed itself of the privilege of conducting activities in Florida.
REVERSED.
SAWAYA and ORFINGER, R.B., JJ., concur.